UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

UNITED STATES OF AMERICA                                                                                           Plaintiff

v.                                                                                              Criminal Action No. 4:24-CR-9

BARRY LEE MAIDEN                                                                                                Defendant

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Defendant Barry Lee Maiden ("Maiden") moves to suppress evidence found in the search of 96 Duff Lane. [DE 29]. The United States responded, [DE 39] and Maiden replied. [DE 41]. A *Frank's* hearing was held on November 8, 2024. [DE 45; DE 47]. After the hearing, Maiden and the United States filed post hearing briefs and replies. [DE 54; DE 55; DE 61; DE 62]. This matter is ripe. For the reasons below, Maiden's Motion to Suppress Evidence is **DENIED**.

**I.      BACKGROUND**

On January 17, 2024, Officer Atherton ("Atherton") first encountered Maiden and Kimberly White ("White") while conducting a traffic stop. [DE 47 at 214]. Atherton arrested Maiden and White for outstanding bench warrants and issued Maiden a traffic citation. [*Id*. at 216]. Atherton recorded Maiden's address as 96 Duff Lane on the citation, which was the address found on Maiden's driver's license. [*Id.*]. Also, during the arrest, Atherton took White's purse to his police cruiser. [*Id*. at 217]. Maiden then told Atherton and White that he would need the keys to his house which were on a key ring in White's purse. [*Id*.]. White also asked Maiden "[w]hat about the dog?" and Maiden replied that he could get somebody to go take care of "our dog" at the house. [*Id*.].

Less than a month later, on February 16, 2024, Officer Embry ("Embry") of the Ohio County Sherriff's Office contacted the United States Probation Office ("USPO") to ascertain an address for White, a known fugitive. [DE 55 at 344]. The USPO informed Embry that on February 6, 2024, White had provided their office her phone number and address at 98 Duff Lane, Beaver Dam. [*Id*]. When officers Embry and Atherton went to serve the arrest warrant, 98 Duff Lane did not exist, but the officers found a trailer at 96 Duff Lane, an address Atherton recognized as Maiden's from his prior traffic stop of White and Maiden. [DE 47 at 164-165].

When Embry arrived at 96 Duff Lane, she found Maiden working in a detached building near the trailer. [DE 54 at 312]. Embry asked Maiden if White was living at 96 Duff Lane and was told that she "had been there within the last 24 hours but he didn't believe she was there now." [DE 47 at 165].[1] Maiden was then placed under arrest for an outstanding warrant. [DE 54 at 312]. Embry asked for Maiden's consent to search the trailer and was told to ask Maiden's sister who lived next door and owned the home. [*Id*.] Maiden's sister did not consent. [*Id*.]. Atherton knocked on the front door and "hollered" for Ms. White to come out, but she never responded. [DE 47 at 192]. Embry and Atherton then called the number the USPO had provided for White. [DE 54 at 312]. While Atherton called the number, Embry walked around the exterior and heard a phone ringing inside the trailer. [*Id*.].

Embry then called the Ohio County Attorney Justin Keown ("Keown") and provided him the information she had obtained. [DE 47 at 193]. Keown recommended the officers obtain a

---

[1] Maiden contends that Embry provided contradictory testimony at the *Frank's* hearing regarding whether Maiden told Embry that White had been at 96 Duff within the last 24 hours. [DE 54 at 312]. Maiden argues that at one point during the hearing Embry had testified that Maiden only told Embry that White "had been there," not that White had been there within the last 24 hours. [*Id*.]. The Court does not find Embry's testimony to necessarily be contradictory. Rather, when stating "she had been there," Embry was responding directly to the question asked about the verbiage Maiden had used. [DE 47 at 188]. No follow up was asked regarding this supposed inconsistency. [*Id*.].

search warrant. [*Id*. at 170]. Embry immediately drove to the Ohio County Attorney's office and met with the County Attorney's legal assistant, April Moon ("Moon"), who wrote out Embry's search warrant affidavit using the information Embry provided. [*Id*. at 172-173]. The affidavit stated in part, that

> [a]ffiant was informed by a Confidential Informant who has provided reliable information in the past, that Kimberly White has been observed in the residence located at 96 Duff Lane, Beaver Dam, Ohio County, Kentucky on multiple occasions, with the last observation being within the past 24 hours. Affiant believes White is staying in said residence. The residence is occupied by Barry Maiden, White has active warrants for her arrest out of Butler County for felony parole violation. While on scene Deputies called the phone of Kimberly White and could hear the phone ringing inside the residence located at 96 Duff Lane. Search of the residence is necessary to locate Kimberly White.

[DE 29-2 at 99-100]. Embry skimmed the typed affidavit and reviewed it for typos, dates, and addresses. [DE 47 at 174]. Keown read the affidavit in its entirety and made edits. [DE 54 at 313]. After Keown and Embry reviewed the affidavit, Embry swore that the contents were true, and the warrant was approved shortly thereafter ("First Search Warrant"). [DE 47 at 195].

While Embry was gone, Maiden told Atherton that White was inside the trailer and offered to go in and get her. [*Id*. at 220]. Atherton did not accept Maiden's offer to retrieve White and waited for Embry to return. [*Id*. At 221]. Embry returned to 96 Duff Lane to execute the First Search Warrant with Atherton. [*Id*. at 222]. When Embry and Atherton entered the trailer, they saw drugs and weapons in plain view, including a firearm Atherton spotted behind a chair. [*Id*. at 179, 222]. White was found hiding in a closet near the back of the trailer where Embry had initially heard a phone ringing. [*Id*. at 179]. White was arrested. [*Id*. at 179]. Based on the drugs and firearms located in plain view within the trailer, officers obtained a second search warrant and searched the trailer ("Second Search Warrant"). [*Id*. at 180]. Pursuant to the Second Search Warrant authorities seized two shot guns, ammunition, .50 grams of

methamphetamine, and 5 buprenorphine pills. [DE 29 at 81]. One shotgun was found in the living room behind the arm of a couch, propped against the wall, and the other shot gun was located on a gun rack hanging on the wall. [*Id.*]. Maiden and White were both subsequently charged for possession of a firearm by a prohibited person. [DE 1 at 1].

## II.   STANDARDS

### 1.   Payton Test for Entry Subject to an Arrest Warrant

Under the Fourth Amendment "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York,* 445 U.S. 573, 603 (1980). The Sixth Circuit has elaborated on this principle, holding that "an arrest warrant is sufficient to enter a residence if the officers, by looking at common sense factors and evaluating the totality of the circumstances, establish a reasonable belief that the subject of the arrest warrant is within the residence at that time." *El Bey v. Roop*, 530 F.3d 407, 416 (6th Cir. 2008) (quoting *United States v. Pruitt*, 458 F.3d 477, 483 (6th Cir. 2006)); *see also Id*. at 482 (explaining that the reasonable-belief standard is easier to satisfy than a showing of probable cause). Under Payton officers must demonstrate a reasonable belief both (1) that the subject of the warrant lived at dwelling to be searched, and (2) that the subject of the warrant was inside the dwelling at the time that they entered. *See United States v. Bervaldi,* 226 F.3d 1256, 1263 (11th Cir. 2000) (explaining the "two-part inquiry" under Payton as requiring that the police have "a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at that time" (internal quotation marks omitted)).

### 2. Probable Cause and the Leon Good Faith Exception

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. "Probable cause is not a high bar." *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022) (quoting *D.C. v. Wesby,* 583 U.S. 48, 57 (2018)) (internal quotations and citation omitted). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44, (1983)). To establish requisite probable cause for a search warrant, an officer must submit an affidavit containing "facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). The affidavit must establish a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)).

When reviewing a finding of probable cause, courts are limited to the "four corners of the affidavit" and should "give great deference" to the issuing magistrate's determination. *Abboud*, 438 F.3d at 571 (citations omitted). Moreover, affidavits should be reviewed on a "totality of the circumstances determination, rather than a line-by-line scrutiny." *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001) (citing *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000)).

The exclusionary rule prohibits the government from using evidence obtained in violation of the Fourth Amendment against a defendant at trial. Its purpose is to deter intentional police misconduct. *See United States v. Calandra*, 414 U.S. 338, 348 (1974) ("the [exclusionary] rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through

its deterrent effect"). Accordingly, evidence should not be suppressed if police obtained it "in objectively reasonable reliance" on the "subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). In *Leon*, the Supreme Court identified four circumstances when an officer's reliance on a search warrant would not be reasonable:

> (1) the magistrate was 'misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;' (2) the magistrate 'abandoned his judicial role' or neutrality; (3) the warrant was 'so lacking in indicia of probable cause' as to render official belief in its existence unreasonable; or (4) the warrant was so 'facially deficient' that it could not reasonably be presumed valid.

*United States v. McClain*, 444 F.3d 556, 564–65 (6th Cir. 2005) (quoting *Leon*, 468 U.S. at 923). Under the first circumstance of an intentional or reckless false statements, the standard for reckless disregard for the truth asks whether the affiant "in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information contained therein." *United States v. O'Neill,* 94 F.4th 531, 539 (6th Cir. 2024), cert. denied, 145 S. Ct. 301 (2024) (quoting *United States v. Cican,* 63 F. App'x 832, 835–36 (6th Cir. 2003)).

### III.    ANALYSIS

Maiden moves to suppress evidence found pursuant to the First Search Warrant issued for 96 Duff Lane, and all evidence uncovered later as a result of the search. [DE 29]. Maiden argues that the affidavit used to secure the First Search Warrant contained knowingly and intentionally false statements that were necessary to the finding of probable cause. [DE 54 at 323]. In the alternative, Maiden argues that the statements were made with reckless disregard for the truth. [*Id*.]. Maiden contends that the following five statements in the affidavit for the First Search Warrant are false; (1) the reference to a confidential informant, (2) that White had been seen at 96 Duff Lane on multiple occasions, (3) that White had been seen at 96 Duff Lane within the last 24 hours, (4) that Embry believed White resided at 96 Duff Lane, and (5) that White had

multiple active warrants for a parole violation. [*Id*. at 324-326]. The United States argues that the search was lawful regardless of false statements for three reasons. First, officers were able to lawfully enter the house to execute an arrest warrant on White under the *Payton* test. [DE 55 at 342]. Second, the false statements were merely negligent, not reckless or intentional, and as such the good faith exception applies. [*Id*. at 355]. And third, Maiden consented to the search of the trailer. [*Id*. at 351].

1. **Arrest Warrant for White and the *Payton* Test**

The United States argues that regardless of the validity of the search warrant obtained for 96 Duff Lane, the United States lawfully entered the property pursuant to an arrest warrant issued for White. [DE 55 at 343]. The United States further argues that under *Payton*, officers had a reasonable belief that White lived at 96 Duff Lane and was located at 96 Duff Lane at the time of the search. [*Id*]. To the contrary, Maiden contends that the information available to officers was insufficient to establish a reasonable belief that White lived at 96 Duff Lane, precluding a search based on the arrest warrant alone. [DE 54 at 332].

As applied to this case, the two components to the reasonable-belief standard as laid out in *Payton* can be stated as follows: the officers must have had a reasonable belief both (1) that White lived at the 96 Duff Lane, and (2) that White was inside the residence at the time that they entered. *Bervaldi,* 226 F.3d at 1263. The first prong of the standard requires that officers take steps to reasonably ensure that they are not entering the home of a third party in violation of *Steagald v. United States,* 451 U.S. 204, 214–15 (1981) (holding that an arrest warrant alone does not authorize officers to enter the home of a third party and that, absent exigent circumstances or consent of the resident, officers must obtain a search warrant before entering the third party's home). *See also United States v. Gay*, 240 F.3d 1222, 1226 (10th Cir. 2001)

(explaining that whether *Steagald* or *Payton* applies is resolved under the first prong of the *Payton* test).

As to the first *Payton* prong, officers Atherton and Embry reasonably believed that White was residing at 96 Duff Lane when they entered the home to execute the arrest warrant. First, the USPO provided Embry with 98 Duff Lane, Beaver Dam, as a current address for White. [DE 47 at 164]. The USPO is a reliable source that these officers had previously used and trusted to locate suspects on probation. [*Id*.]. When officers went to investigate 98 Duff Lane, they discovered that the address did not exist, but found 96 Duff Lane, Beaver Dam.[2] [*Id*. at 204].

Second, Atherton recognized 96 Duff Lane as a possible address for White from a prior traffic stop and arrest on January 17, 2024. [*Id*. at 214]. On January 17, 2024, Atherton pulled over White and Maiden driving together. [*Id*.]. Maiden's license listed 96 Duff Lane as his address, which Atherton recorded on the traffic citation before both were arrested on outstanding warrants. [*Id*. at 216]. Atherton noted several interactions between White and Maiden which led him to believe the two lived together. First, during the stop Atherton heard Maiden tell White that he would need the keys to his house which were on a key ring in White's purse. [*Id*. at 217]. As a result, it was reasonable for Atherton to infer that they shared a residence as White appeared to have keys (or access) to the residence. During this conversation White also asked Maiden "What about the dog?" and Maiden replied that he could get somebody to go take care of "our dog" at the house. [*Id*.]. Again, it was reasonable for Atherton to infer that they shared a residence given that Maiden indicated their shared dog was also located at the house. According

---

[2] Atherton's previous interaction with Maiden and White, as well as officers' interaction with Maiden at 96 Duff Lane, provide additional support for officers' contention that 98 Duff Lane was a typo and their reasonable reliance on the information provided by the USPO. [*Id*. at 233].

8

to Atherton, this interaction less than a month prior to the search led him to reasonably believe that Maiden and White lived together at 96 Duff Lane. [*Id*. at 165, 227].

As to the second *Payton* prong, Maiden does not specifically contest that officers had a reasonable belief that White was at 96 Duff Lane at the time of the search. Officers found Maiden at 96 Duff Lane, and he confirmed White had been in the house within the last 24 hours when they first arrived at the trailer. [DE 47 at 165] Moreover, Embry heard White's phone ringing from inside of the home when Atherton called it using the phone number provided by the USPO. [*Id*. at 168]. And finally, Maiden himself told Atherton that White was inside the house when Embry left to obtain a search warrant. [*Id*. at 220]. Taken together, this information is sufficient to form a reasonable belief that White lived at 96 Duff Lane and that she was likely present on the property when they entered, satisfying the *Payton* test.

Maiden makes several arguments alleging that individual facts used to establish reasonable belief of White's residence were insufficient to establish reasonable belief or had alternate inferences that officers could have made. However, reasonable belief is "based on 'common sense factors' and 'the totality of the circumstances.'" *United States v. Dunbar,* No. 22-3087, 2022 WL 17245098, at *2 (6th Cir. Nov. 28, 2022*)* (citing *El Bey v. Roop*, 530 F.3d 407, 416 (6th Cir. 2008)). This standard does not require that officers be certain that White resided at 96 Duff Lane or find that there was no alternative explanation for every inference officers make. *United States v. Jett*, No. 4:09CR297, 2009 WL 4043350, at *4 (N.D. Ohio Nov. 20, 2009). The Sixth Circuit has also previously held that a reasonable belief standard is easier to satisfy than probable cause which would also be satisfied with the information possessed by officers. *Pruitt*, 458 F.3d at 482.

First, Maiden claims that if officers held a reasonable belief that White lived at 96 Duff Lane, they would not have bothered with a search warrant, and that the Court should consider this as part of the totality of the circumstances. [DE 61 at 384-85]. The Court does not believe that officers seeking a search warrant before entry of a home provides any support to the idea that they did not reasonably believe White resided there, and Maiden provides no legal support to the claim that this is relevant information the Court should consider. *See generally United States v. Hinojosa*, 606 F.3d 875, 885 (6th Cir. 2010) (agents' prudence in seeking a search warrant, however, does not negate the existence of probable cause). Further, legitimizing this theory sets a harmful precedent which disincentivizes officers from seeking search warrants out of fear that courts will read their actions as evidencing a lack of reasonable belief or probable cause. This Court declines to support such a theory.

Second, Maiden argues that the Officers' belief that White resided at 96 Duff Lane was unreasonable as she "lacked common authority or some other significant relationship" to the residence. [DE 61 at 386]. This standard comes from a wholly separate test with different standards of proof that applies to third party consent to search. It does not apply to the *Payton* test. The Court will not conduct an analysis of the unrelated common authority test when dealing with a question of entry subject to an arrest warrant.

Finally, Maiden argues that Embry was unlawfully in the curtilage of 96 Duff Lane when they heard the phone ring, and as such, it is inadmissible and cannot support probable cause. [DE 61 at 382]. However, Maiden raises this argument for the first time in his reply brief, and it is well accepted in the Sixth Circuit that a party "cannot raise new issues in a reply brief . . . [they] can only respond to arguments raised for the first time in [the opposing party's] brief." *United*

*States v. McGlade,* No. 17-20261, 2021 WL 2012846, at *1 (E.D. Mich. May 20, 2021) (quoting *United States v. Campbell,* 279 F.3d 392, 401 (6th Cir. 2002)).

Even if Maiden's argument had been properly raised, the argument fails on the merits. The Fourth Amendment is not implicated by a "knock and talk," where officers "knock[ ] on the front door and seek[] to speak to an occupant for the purpose of gathering evidence." *Florida v. Jardines*, 569 U.S. 1, 1423 (2013) (citing *Kentucky v. King*, 131 563 U.S. 452, 469 (2011)). Furthermore, in the Sixth Circuit, when "knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage." *Hardesty v. Hamburg Township*, 461 F.3d 646 (6th Cir. 2006). It is well established that officers believe White was inside 96 Duff Lane at the time of the call, and before officers attempted to call White "Atherton knocked and hollered for Ms. White to come out," but she never responded. [DE 47 at 192]. It was only after trying the front door that Atherton called White and Embry began walking around the trailer. [*Id*]. Even if Embry did intrude into the curtilage of the trailer, officers were taking reasonable steps to contact White who they reasonably believed to be in the house after attempting to contact her at the front door. Therefore, any slight intrusion into the curtilage was reasonable and "within the scope of a proper knock and talk." *United States v. Manning*, No. CRIM. 13-20-GFVT, 2015 WL 807574, at *17 (E.D. Ky. Feb. 23, 2015), *aff'd*, 652 F. App'x 397 (6th Cir. 2016).

Officers satisfied both elements of the *Payton* test when entering 96 Duff Lane to carry out the arrest warrant on White. Regardless of the validity of the search warrant at issue in this case, the initial entry into 96 Duff Lane was lawful, and items in plain view at the time the arrest

warrant was executed are not excluded. Maiden's Motion to Suppress Evidence obtained from the search of 96 Duff Lane [DE 29] is **DENIED**.

2. **Good Faith Exception**

Although the Court has already determined that the initial entry of 96 Duff Lane was lawful pursuant to the arrest warrant for White, for the sake of completeness the Court analyzes Maiden's argument regarding false statements contained in the search warrant affidavit. Maiden argues that the good faith exception to the search warrant requirement fails because Embry knowingly and intentionally provided false statements in her affidavit. [DE 54 at 324]. Maiden also argues that in the alternative Embry's affidavit exhibited a reckless disregard for the truth. [*Id.* at 327]. The United States concedes that the affidavit contained false statements but contends that these statements were merely negligently made and do not defeat the good faith exception. [DE 55 at 355].

   i.   *Intentional Falsehood*

Maiden argues that Embry knowingly and intentionally made false statements in her warrant affidavit. [DE 54 at 323]. First, Maiden argues that the number of mistakes found in the warrant affidavit alone justifies a finding of knowing falsity. [*Id.*]. According to Maiden, four sentences in the affidavit contain statements that support probable cause, and three of these sentences contain a total of five false statements. [*Id.* at 324].

Maiden, however, does not provide caselaw that supports the contention that the number of mistakes in an affidavit has a bearing on Embry's knowledge and intent. Under Sixth Circuit caselaw, just because "there is a misstatement in the search warrant affidavit, it does not necessarily follow that it was made intentionally or with a reckless disregard for the truth." *United States v. McCreary,* No. 09-CR-20191, 2010 WL 1052436, at *10 (E.D. Mich. Mar. 19,

2010), aff'd, 489 F. App'x 87 (6th Cir. 2012*) (*citing *United States v. Sawyers,* 127 F. App'x 174, 181–86 (6th Cir. 2005)). It is conceivable that an affidavit could contain so many false statements that the number of inaccuracies in the affidavit would lead a court to believe that an officer must have knowingly and intentionally provided the false statements or acted with a reckless disregard for the truth. However, this is not the case here. Although Embry's affidavit does contain several errors and false statements, Maiden overstates the number and significance of misstatements in the affidavit. The third contested statement, that White had been seen at 96 Duff Lane within the last 24 hours, is not a false statement. Embry consistently stated on the record that Maiden informed her that White had been at 96 Duff Lane within the last 24 hours. [DE 47 at 165, 187, 208]. The basis of Maiden's contention that this statement was false comes from a response at the *Franks* hearing to the question "did he state that specifically, that she had been there within the last 24 hours, or did he use different verbiage?" to which Embry responded, "[h]e said that she had been there." [*Id*. at 188]. This was a direct response to the question which asked about the verbiage used and does not contradict Embry's prior testimony. The fourth contested statement, that Embry believed White resided at 96 Duff Lane, is also not a false statement. Maiden challenges the basis for Embry's belief, but Embry explained how she came to believe that White lived at 96 Duff Lane, not 98 Duff Lane, which the Court addressed above. [*Id*. at 5]. As such the Court does not find that Embry's statement that she "believes White is staying in said residence" is false. Finally, although the fifth statement that White had multiple warrants was technically false, for the purposes of probable cause one warrant versus multiple is inconsequential. The existence of a single warrant would have been sufficient to issue the search warrant of 96 Duff Lane. The false statements in the affidavit are not so numerous or severe that they alone indicate they were made knowingly and intentionally.

Second, Maiden briefly argues that the fact that the affidavit was reviewed and edited by Keown, but still contained inaccuracies, is proof of knowledge and intent. [DE 54 at 327]. Maiden again fails to cite to law or record in support of this contention. Maiden offers no proof of Keown's knowledge of the inaccuracies in the affidavit, or Embry's knowledge of any changes made to the affidavit. These unsupported conclusions of Embry and Keown's apparent knowledge are insufficient to show intentional or knowing falsity. Every witness who provided testimony at the Franks hearing in this matter, Embry, Atherton, Hunter, and Keown, testified that they did not possess any knowledge of these mistakes, and that any mistakes were unintentional. [DE 47 at 171–74, 177, 178–79; DE 47 at 222; DE 47 at 235; DE 52 at 277]. Without any actual evidence on the record that Embry knowingly or intentionally made false statements in her affidavit, Maiden's argument fails.

    *ii.*    *Reckless Disregard for the Truth*

With Maiden's argument of knowing falsity denied, Maiden argues in the alternative that Embry's actions constitute reckless disregard for the truth for the same reasons argued to prove knowledge and intent. To find reckless disregard for the truth the Court must ask whether the affiant "in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information contained therein*.*" *O'Neill,* 94 F.4th at 539. This standard goes to the officer's "knowledge or state of mind at the time the officer wrote the allegedly false affidavit." *Butler v. City of Detroit, Michigan,* 936 F.3d 410, 420 (6th Cir. 2019).

First, Maiden repeats his argument that the number of false statements is sufficient to prove recklessness. This argument fails for the same reasons it fails for knowledge. Although the affidavit does contain several false statements or errors, Maiden overstates the number and severity of the false statements in the affidavit. As stated above, the false statements are not so

numerous or severe that they necessarily show reckless disregard as to the truth. *McCreary,* 2010 WL 1052436, at *10.

Second, Maiden argues that Embry was reckless for merely skimming the affidavit instead of reading it thoroughly. [DE 54 at 327]. However, the case Maiden cites to support this contention, *United States v. O'Neill*, does not mention a distinction between reading and skimming in any capacity. 94 F.4th at 540. In fact, *O'Neil*, which is cited by both parties, holds that when an officer "[takes] steps to ensure the accuracy of the information" the fact that they took care to check their work is far from evidence of "a culpable mental state." *Id*. at 539-40. Maiden argues that because *O'Neil* holds that reading an affidavit is inherently not reckless, it holds that when an officer "merely skims, rather than actually reads the probable cause affidavit drafted by someone else" they are being reckless. [DE 54 at 329]. The Court finds this argument to be unpersuasive. Maiden's argument is unsupported by *O'Neil*, and the rational for this argument is flawed. The Sixth Circuit holding that proofreading a document is inherently not reckless does not mean that anything less must be reckless. Additionally, despite Maiden's argument to the contrary, skimming a document still constitutes review and requires reading parts of the document. By reviewing the affidavit, even if briefly, Embry "did take care to check her work," as did Keown. *Id*. at 540 (citing *Butler v. City of Detroit, Michigan*, 936 F.3d 410, 421 (6th Cir. 2019)) Since *O'Neil* finds that reading and reviewing the affidavit for error does not evidence the culpable mental state required for recklessness, and "skimming" the document constitutes review, the Court finds that Embry lacked the mental state required for reckless disregard. Maiden's argument that the good faith exception does not apply fails. Maiden's motion to suppress is **DENIED**.

While the Court finds no grounds for these errors to be knowing, intentional, or made with a reckless disregard for the truth, the drafting of the affidavit was sloppy. [DE 55 at 341]. While not a close call, in particular because of the circumstances surrounding the initial traffic stop of Maiden and White, Maiden's filing of this motion was understandable given the errors in the affidavit. The finding here by no means is intended to excuse or condone the errors made in the drafting process. These affidavits are critical documents, and their accuracy is of utmost importance. *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996) ("[I]t is imperative that affidavits accurately reflect the facts of the particular situation at hand." (citing *United States v. Richardson*, 861 F.2d 291, 294–95 (D.C. Cir. 1988), cert. denied, 489 U.S. 1058, (1989))). The Court notes with approval that testimony during the hearing indicates changes have been made to the process for drafting these affidavits. [DE 52 at 301-302].

### 3. Consent

The United States also argues that Maiden consented to the search of his home. The Sixth Circuit has held that "the government bears the burden of demonstrating by a preponderance of the evidence, through clear and positive testimony, that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Alexander*, 954 F.3d 910, 918 (6th Cir. 2020) (citing *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009)). The Court must examine the "totality of the circumstances" to determine whether plaintiff voluntarily consented to the search. *Id.* (quoting *United States v. Riascos-Suarez,* 73 F.3d 616, 625 (6th Cir. 1996)). To determine whether there was voluntary consent courts in the Sixth Circuit ask two questions: (1) whether an individual's "actions adequately demonstrated consent," and (2) whether "other factors contaminated" that consent. *United States*

*v. Blomquist*, 976 F.3d 755, 759 (6th Cir. 2020) (quoting *United States v. Bond*, 433 F. App'x 441, 443 (6th Cir. 2011)).

According to the United States, Maiden consented to the search by telling Atherton that "White was inside the residence and that he would open the door and he could go get her." [*Id*. at 220]. The United States does not point to any additional statements or actions to support their argument for consent. There is no caselaw within the Sixth Circuit where police used an offer from a defendant to retrieve the subject of an arrest warrant from inside their home as grounds for consent to search the premises. Maiden only ever specifically offered to get White from the house himself, and nothing about this statement implies that Maiden was permitting officers to search the house personally, let alone unequivocally. *United States v. Worley,* 193 F.3d 380, 386 (6th Cir. 1999).

The cases cited by the United States in support of their contention that Maiden consented to the search of his trailer are unavailing. The United States argues that the court in *United States v. Murphy* upheld a search based on a third party stating, "I'll show you where it is" and "there's a gun in the house and I'll get it for you." F.3d 1266 (6th Cir. 1997). However, the United States omits a crucial fact found in the sentence immediately prior to their quote: those statements were only made "after signing the consent form" for the search. *Id*. Further, the court in *Murphy* does not address the argument of consent as the defendant failed to assert it properly. *Id*. As such the United States' argument from *Murphy* is based on pure dicta, not binding law of the Sixth Circuit. The United States encounters the same problem with *United States v. Guerrero*, where the defendant likewise signed a consent form before the search began. No. 3:19-CR-00118, 2023 WL 5916597, at *12 (M.D. Tenn. Sept. 11, 2023). *Guerrero* also involved the search of a phone

17

which Guerrero not only explicitly told officer they could search, but which he retrieved and unlocked for officers. *Id*.

The United States also cites to *United States v. Chambers*, where the Northern District of Michigan found consent where a defendant told officers to "go ahead" after they asked if they could search him. No. 13-CR-20684, 2014 WL 3900585, at *1 (E.D. Mich. Aug. 11, 2014), aff'd, 646 F. App'x 445 (6th Cir. 2016). Although this is more on point and shows that verbal consent to search can be sufficient, this case is still distinguishable. Officers explicitly asked Chambers if they could search him, there was no ambiguity in the context or purpose of Chambers' statements, and he gave the affirmative consent to search which is usually upheld by the Sixth Circuit. *See United States v. McCauley*, 548 F.3d 440, 447 (6th Cir. 2008) (finding that the statements "go ahead and search," "take a look," "you can go ahead and check," or "help yourself" conveyed voluntary consent). Maiden was not asked by Atherton if he could search the trailer before Maiden offered to retrieve White, and Maiden's statement does not plainly demonstrate an intent to consent to a search of the trailer. The Court reads Maiden's statement that "he could go get [White]" in its simplest common-sense interpretation. That Maiden was offering to enter his home and bring White out so that officers could execute their arrest warrant, not that he was making an unprompted offer to search his home.

This Court finds that Maiden did not unequivocally or specifically consent to the search of his home by merely offering to retrieve the subject of an arrest warrant from inside. Because Maiden's actions did not adequately demonstrate consent, the Court need not examine whether "other factors contaminated" that consent.

## IV. CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, **IT IS ORDERED** that Maiden's Motion to Suppress [DE 29] is **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

March 4, 2025